JOHN HANCOCK MUTUAL LIFE INSURANCE
COMPANY *v.* FIDELITY-BALTIMORE
NATIONAL BANK & TRUST COM-
PANY ET AL.

(Three Appeals in One Record)

[No. 105, October Term, 1956.]

*Decided March 14, 1957.*

*Motion for rehearing filed April 11, 1957, denied April 12, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ., and MICHAELSON, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Harry Adelberg* and *Barnett L. Silver* for the appellant.

*Robert D. Bartlett,* with whom were *C. Damer McKenrick* and *Bartlett, Poe & Claggett* on the brief, for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

Three judgments were entered in the Superior Court of Baltimore City, after the court had sustained demurrers of the several defendants to three separate amended declarations as particularized, without leave to the plaintiff to amend. The three appeals are taken therefrom and are joined because all three cases involve substantially the same or similar facts and substantially the same questions of law.

The several amended declarations show that John Hancock Mutual Life Insurance Company, (Hancock) the appellant (legal plaintiff), has its principal office in Boston, Massachusetts, and maintained a branch office in Baltimore, Maryland, which was managed by a then trusted employee, one Robert J. Wright. Hancock had outstanding a fidelity bond or policy with The Employers' Liability Assurance Corporation, Ltd. (the "use" plaintiff), hereinafter referred to as "Employers'", insuring it against loss sustained by reason of the defalcation or dishonesty of trusted employees. At that time, Hancock maintained three separate checking accounts, one in Baltimore, with the then Fidelity Trust Company, and two in Boston, one with the Second National Bank of Boston, and the other with the First National Bank of Boston. Beginning with July, 1949, Wright, in his capacity as manager of its Baltimore office, began to present to Hancock a series of fictitious claims on behalf of supposed Maryland claimants. On receiving these claims in Massachusetts, Hancock, acting in the belief that the claims were genuine, drew its checks in payment and mailed them to its Baltimore office, to be from there delivered to the purported claimants, the payees named in the checks. On reaching Hancock's Baltimore office, the checks were taken possession of by Wright, who indorsed them with the names of the fictitious payees, and then deposited or cashed the checks with either the Calvert Bank or the Equitable Trust Company. These two banks, in turn,

would then indorse the checks with their own names, specifically guarantee the prior indorsements, and collect the proceeds from the several drawee banks, one in Baltimore and two in Boston. Hancock discovered the fraud sometime in the year 1952, and immediately notified or caused to be notified all concerned, including the appellees in these cases.

On ascertaining the full amount of its loss occasioned by the payment of the checks, Hancock made claim under its policy of fidelity insurance on Employers', the "use" plaintiff below. Following this, Hancock made a written assignment of its claims on the checks to Employers' and received $38,185.61 payment in full of all the checks involved in these cases. A brief summary of the three cases shows the following pertinent facts:

CASE NO. 1.—Superior Court File No. 30123—This case, against Fidelity-Baltimore National Bank & Trust Company, as successor to the Fidelity Trust Company, and to the Calvert Bank, involves fourteen (14) checks, totaling $30,303.05. Eight of the checks, totaling $5,506.80, were drawn on the Fidelity Trust Company, and cashed at the Calvert Bank. Five (5) of the checks, totaling $24,293.91, were drawn on the Second National Bank of Boston, and cashed at the Calvert Bank. One (1) check, for $502.34, was drawn on The First National Bank of Boston, and cashed at the Calvert Bank.

CASE NO. 2.—Superior Court File No. 30404—This case, against both Fidelity-Baltimore National Bank & Trust Company and The Equitable Trust Company, involves three (3) checks, totaling $2,219.00. These checks were all drawn on the Fidelity Trust Company and cashed at The Equitable Trust Company.

CASE NO. 3.—Superior Court File No. 30405—This case, against The Equitable Trust Company alone, involves three (3) checks, totaling $5,663.56. Two (2) of the checks, totaling $5,118.56, were drawn on The Second National Bank of Boston. One (1) of the checks, for $545.00, was drawn on The First National Bank of Boston. As to all of these checks, the appellee, The Equitable Trust Company, is a collecting or intermediary bank.

Following the filing of the three amended declarations in these cases, the several defendants filed demands for particulars in each of which the sole question asked was—"Under what jurisdiction did the plaintiff issue the checks referred to in the amended declaration?" To each of the demands the plaintiff filed a bill of particulars, giving as the one answer, that "The checks referred to in the amended declaration were drawn in the plaintiff's home office in Boston, Massachusetts. They were then mailed to the plaintiff's branch office in Baltimore, Maryland, to be there issued and from there delivered to the payees named on the checks."

The several appellees, each, then filed demurrers to the respective amended declarations as particularized, and the trial court sustained the demurrers, without leave to amend.

The question presented for our decision is: Was this ruling of the trial court correct? It is conceded by the appellees the cases turn upon whether the law of Massachusetts or the law of Maryland applies to checks drawn as above, so as to render them payable to bearer or not payable to bearer. Without setting forth in detail the statutes involved, it is conceded by both sides that the Massachusetts statute, Ann. Laws of Mass. (1941) Ch. 107, Sec. 31, makes checks payable to the order of fictitious or non-existing persons, under the circumstances mentioned above, payable to bearer; while the Maryland statute, Art. 13, Sec. 29, does not. It was also conceded the payees were fictitious persons. If the Massachusetts' law applies and the checks were made payable to bearer, the respective banks had a right to cash them without any indorsements. On the other hand, if the Maryland law be applicable and the checks were not payable to bearer, the indorsements would be forgeries for which the said banks would be responsible.

The appellant contends the Maryland law is controlling; that there was no delivery of the checks made in Massachusetts, and, although mailed to its agent in Baltimore, Hancock had the power and authority to direct that they be not delivered to the supposed payees; that until delivery, the checks as such had no legal existence; and the indorsements were, therefore, forgeries and the banks were answerable.

The appellees counter by claiming the checks are bills of exchange; that in these cases there were no contracts or meetings of the minds, as the payees were "either non-existent, fictitious, or if alive, unaware" their names were being used; and that the undertakings of Hancock *were made at the times it signed the checks in Boston.*

Questions relative to negotiable instruments arising upon a conflict of laws are not always free from difficulty. The Negotiable Instruments Act makes no provisions as to what law governs bills and notes in a case of conflict of laws, and, in determining this question, it is necessary to consider certain factors. Some of these are: (1) That the law relating to what law governs contracts in general is applicable, so far as general principles are concerned; (2) that there is considerable conflict in the decisions relating thereto; (3) that general statements in the decisions should be controlled by the specific statements of law in regard thereto; (4) that an ordinary negotiable instrument often includes many contracts, each several signature—as maker, drawer, acceptor, guarantor, surety or indorser—being a separate contract; (5) and that each separate contract may bring into question a different place and law, since each contract involves a place of contract and a place of payment which may be governed by different laws. In like manner, one law may determine the validity of a contract, while other laws regulate its form or construction or the steps to be taken for its maintenance or enforcement. 10 *C. J. S., Bills and Notes,* par. 47. It seems generally to be conceded that the proper law governing a bill or note is the law which the parties to the instrument intended to govern. Accordingly, if the bill or note contains express provisions that it shall be governed by the laws of a particular state, those laws govern.

The checks in these cases were signed by Hancock in Boston and mailed to its agent in Baltimore. Under Art. 13, Sec. 205 of the Maryland Code and Ann. Laws of Mass. Ch. 107, Sec. 208 checks are bills of exchange, but these are not controlling. The mere signing of a check creates no contract or liability thereon until delivery in accordance with Sec. 36

of Art. 13 of the Maryland Code (1951), or Ch. 107, Sec. 38 of the Ann. Laws of Mass. which specifically provide:

> "Every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect thereto. * * * "

The well known author, Joseph H. Beale, in his work *The Conflict of Laws,* Vol. II, par. 312.2, citing numerous authorities, uses the following pertinent language:

> "* * * Since, however, a contract is a promise, or set of promises, to which the law attaches legal obligation, and since it cannot be said that there is any obligation in a claim to which there is a complete defence, i. e., a claim which the law will not enforce, it seems accurate to say that value is a prerequisite to the creation of any contract on a negotiable instrument, as has often been recognized.
>
> "It follows that the place of contracting of a contract on a negotiable instrument, be it the obligation of the maker, the drawer, or the endorser, is the place where, after the signature of the party in question, the instrument is first delivered for value. Since no one is bound by the mere signature of the instrument, the place where it may have been dated, executed, or signed is immaterial. If the instrument is mailed to the recipient as he authorized in accordance with some prior agreement, the recipient is bound to his contract as soon as it is posted, and has therefore given value, and the place of contracting is where the instrument is mailed. * * * If the instrument in question is delivered by an agent of the promisor, it is still in his control and hence is revokable and ineffective until the agent delivers it, as in the case of other formal contracts, and the place of contracting is where the agent delivers it."

And in the equally well known work, *Daniel on Negotiable Instruments,* 7th Ed., at par. 1017, is found the following:

> "The place where a contract is made depends not

upon the place where it is written, signed, or dated, but upon the place where it is delivered as consummating the bargain. Thus, the law of the place where a bill or note is written, signed, or dated does not necessarily control it, but the law of the place where it is delivered from drawer or maker to payee, or from indorser to indorsee, * * *. A note drawn and dated in Maryland, but delivered in New York, in payment of goods there purchased, or money loaned, is payable in and governed by the laws of New York. * * * And if a note be dated and signed in blank in Virginia, and sent to Maryland, and there filled up and negotiated, it is a Maryland, and not a Virginia, note. Where a note was dated in Missouri, and signed by one maker there, and was then signed by other makers in Iowa and there delivered, it was held to be governed by the laws of the latter State. * * * In a Maine case it appeared that a husband and wife executed a note in Massachusetts, the wife being surety for her husband, and the husband delivered it by mail to the payee in Maine. By the law of Massachusetts the wife could not so bind herself, but in Maine a married woman could contract for any lawful purpose. The law of Maine was held to apply, and the wife held liable."

As there was no delivery of the checks by or on behalf of Hancock, we hold, as below indicated, they never created legal contractual obligations against it in this case.

As long as the checks remained in the hands of the drawer or its agent, they were nullities. *Daniel on Negotiable Instruments,* 4th Ed., par. 63; *Devries v. Shumate,* 53 Md. 211, 215, 216; *Beale, The Conflict of Laws,* Vol. 2, pg. 1047.

They were, however, negotiated, when cashed by Wright in Maryland in accordance with Sec. 50 of Art. 13 of the Maryland Code, and Ch. 107, Sec. 53 of the Ann. Laws of Mass. which state (quoting from the Maryland statute):

"An instrument is negotiated when it is transferred from one person to another in such manner

> as to constitute the transferee the holder thereof. If payable to bearer, it is negotiated by delivery; if payable to order, it is negotiated by the indorsement of the holder completed by delivery."

So far we have no conflict in the laws of the two states, but, as above stated, when thus negotiated, if the law of Massachusetts relative to checks made payable to fictitious payees prevailed, the checks were rendered payable to bearer and as such negotiated by delivery and no indorsements were necessary, thereby creating binding contracts on Hancock as under Ch. 107, Sec. 38 of the Ann. Laws of Mass. delivery would have been conclusively presumed. If, however, the Maryland law governed, the checks were not rendered payable to bearer and proper indorsements were necessary to relieve the banks from responsibility for cashing them. It, therefore, becomes necessary, as above stated, to determine whether the law of Massachusetts or the law of Maryland was applicable when the banks cashed the checks.

We think the law of Maryland governed. *Beale, The Conflict of Laws,* Vol. 2, par. 312.2; *Daniel on Negotiable Instruments,* 7th Ed., par. 1017; *Chemical National Bank v. Kellogg,* 183 N. Y. 92, 75 N. E. 1103. Cf. *Restatement of the Law—Conflict of Laws,* Sec. 349, Ill. 1 under (e). Cf. *Lizardi v. Cohen,* 3 Gill 430, 438; *Union Tr. Co. of N. J. v. Knabe,* 122 Md. 584, 607, 89 A. 1106, 1116. See also *United States v. Guaranty Trust Co.,* 293 U. S. 340, where the Supreme Court said: "As the Government sent the check to Yugoslavia and the forged endorsement and the transfers of the check were made there, its law governs the validity of the transfer; * * *." We, therefore, hold the law of Maryland was applicable when the checks were cashed or received for deposit by the banks; that the checks were not bearer paper negotiable by delivery; and that the checks were cashed, or received for deposit, upon forged indorsements.

When the checks were so cashed or received for deposit, by the collecting banks, and thereafter paid by the drawee banks, the legal rights and obligations of the respective par-

ties became fixed. They are well set forth by this Court in *Nat. Union Bank v. Rubber Co.,* 148 Md. 449, 455, 456, 129 A. 688, wherein is said,

> "Where, however, a collecting bank cashes a check on a forged endorsement a different principle applies. There the collecting bank on the forged endorsement acquires no title whatever to the paper because the endorsement, its only source of title, is a nullity. It therefore is wrongfully in possession of the check and in equity and good conscience holds it for the payee. If, while in possession of it, it by means of the forged endorsement collects it, then it holds the proceeds of the collection in the same way for the payee, and that relationship creates a privity between it and the payee. And if the payee elects to ratify the collection of the check by the collecting bank he may recover from it the amount collected."

And on those occasions where the defendant drawee bank, Fidelity Trust Company, paid its depositor's funds to the collecting banks, the rights and obligations of the parties are given by this Court in *Union Trust Co. v. Soble,* 192 Md. 427, 430, 431, 64 A. 2d 744, as follows:

> "It is an established rule that when a bank receives money on deposit, it impliedly contracts to pay the depositor's checks only to the persons to whom they are made payable or upon their genuine indorsements. A bank on which a check is drawn is bound at its peril to identify the payee and to ascertain that the indorsement on the check is genuine."

The trial court decided the demurrers on the authority of the case of *Swift & Co. v. Bankers Trust Co.,* 280 N. Y. 135, 19 N. E. 2d 992. There, a clerk in the Chicago office, charged with preparing vouchers, induced the plaintiff, an Illinois corporation, to draw checks to the order of a fictitious payee. The clerk then indorsed the checks, *deposited them in an account which he controlled in Chicago,* and they were paid by the New York bank upon which drawn. The plain-

tiff claimed that the bank had wrongfully paid the checks upon forged indorsements, and brought suit for the sums so charged against its balance. The Illinois fictitious payee statute was precisely the same as that of Massachusetts; the New York provision was the same as Maryland's. So, if the plaintiff's obligations as drawer of a check were controlled by the Illinois law the checks were bearer paper and rightfully paid, but if the New York law governed, the bank was liable for paying on forged indorsements. The Court properly held the Illinois statute was applicable and the plaintiff could not recover. The distinguishing feature between that case and this is, that there the checks were both signed and first negotiated for value in Illinois, while in this case the checks were signed in Massachusetts but first were negotiated for value in Maryland. And the same situation prevailed in the case of *Amsinck v. Rogers,* 189 N. Y. 252, 82 N. E. 134, cited in the *Swift* case, where the bill of exchange "was drawn and indorsed and transferred to appellants in New York."

As we think the Maryland law governs the transactions involved herein, we hold the trial court was in error in sustaining the demurrers.

In making this decision, we hold that Art. 13, Sec. 29 of the Maryland Code governed the checks when they were first negotiated in Maryland for value. We decide nothing else at present. Further demarcation of the line between matters relating to the interpretation of a negotiable instrument and matters relating to performance must be postponed until such problems are directly presented.

> *Judgments reversed, with costs, and case remanded for further proceedings not inconsistent with this opinion.*