671 A.2d 22

**HARTFORD FIRE INSURANCE CO.**

v.

**MARYLAND NATIONAL BANK, N.A.**

**Misc. No. 21, Sept. Term, 1995.**

Court of Appeals of Maryland.

Feb. 7, 1996.

Chasanow, J., concurred in result only.

**410**

Robert W. Ludwig, Jr. (C. Erik Gustafson, Ludwig & Welch, P.L.L.C., on brief), Washington, DC, for Appellant.

Jefferson V. Wright (E. Hutchinson Robbins, Jr., Kimberly L. Limbrick, Miles & Stockbridge, on brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

In this case, we determine whether a drawer can bring suit against a depositary bank when (1) it accepts a check with no indorsement for deposit into an account other than that of the named payee or (2) when the depositary bank accepts a check in violation of a restrictive indorsement.

## I

From 1969 to 1993, Eugene Carbaugh served as the head of the accounts payable department of the Prince George's County Board of Education (the Board). In 1982, Carbaugh began submitting fictitious bills to the Board using names such as "PEPCo" and "Bionomics Product Co." After checks were issued by the Board to pay the fictitious bills, Carbaugh deposited the checks into bank accounts opened in his name at Maryland National Bank (MNB).[1]

Carbaugh's scheme was not discovered until 1993. By then, he had stolen about $1.1 million dollars from the Board. The Board recovered most of its losses from the Hartford Fire Insurance Co. (Hartford), its insurance carrier. As subrogee and assignee of the Board's claims, Hartford brought an action

---

1. Carbaugh originally opened his accounts with the Bank of Maryland. MNB acquired the Bank of Maryland in 1985, and MNB has recently been acquired by NationsBank. It is not necessary to treat these banks separately, and for the sake of simplicity, we will refer to all of them collectively as "the depositary bank" or "MNB."

in the United States District Court for the District of Maryland against MNB seeking to hold MNB liable for the Board's loss.

In July 1995, the district court issued a memorandum of partial decision in which it concluded that MNB had accepted at least eight and possibly as many as fifty checks containing restrictive indorsements, in violation of those restrictive indorsements. As found by the district court, "MNB violated restrictive indorsements which required MNB to deposit the checks into an account of 'BIONOMICS PRODUCTS CO INC' or some variation thereof. Instead, MNB wrongly deposited the checks into the account of 'Eugene N. Carbaugh.' " In addition, the district court found that MNB improperly accepted 35 checks from Carbaugh written to "BIONOMICS PRODUCTS CO INC" or "PEPCo" with missing indorsements; it noted by way of example that "some checks are made out to joint payees but include only one indorsement.... Some of the checks include as a purported indorsement only the stamped or typed words 'for deposit only to within payee only' and an account number...."

In its memorandum, the district court also found that in accepting checks with missing indorsements and in violation of restrictive indorsements, MNB failed to follow commercially reasonable banking practices. It further concluded that if a drawer can bring an action directly against a depositary bank under Maryland law, MNB would be liable to Hartford for improperly disbursing funds to Carbaugh for those checks with missing or restrictive indorsements.

The district court, however, found the question of whether the drawer of a check could sue a depositary bank to be a "significant, debatable and unresolved question[ ] of Maryland law." To resolve this issue, the district court certified the following two questions to this Court pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1995 Repl.Vol.) §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article and Maryland Rule 8–305:

1. Can the drawer of a check recover from a depositary bank that accepted the check with a missing indorsement?

2. Can the drawer of a check recover from a depositary bank that violated a restrictive indorsement?

## II

### A

■ The rights and duties of drawers and depositary banks are governed by Maryland Code (1975, 1992 Repl.Vol., 1995 Supp.) Titles 3 and 4 of the Commercial Law Article, which are essentially the same as Articles 3 and 4 of the Uniform Commercial Code (UCC).[2] In addition, where the Commercial Law Article does not expressly resolve an issue, "the principles of law and equity ... shall supplement its provisions." § 1–103. In a case such as this, where Titles 3 and 4 do not directly define or limit a drawer's right of action, we must look to the structure of rights and duties explicitly imposed by statute and any pre-existing rights and duties under Maryland's common law.

■ Under Titles 3 and 4, "[t]o the extent that the forger is unavailable or insolvent, the burden of loss from a forged indorsement is generally placed on the person who dealt with and took the instrument in question from the forger." George C. Triantis, *Allocation of Losses from Forged Indorsements on Checks and the Application of § 3–405 of the Uniform*

---

[2]. Section 4–105 defines the roles in which a bank may participate in a commercial paper transaction. Under § 4–105(a), " '[d]epositary bank' means the first bank to which an item is transferred for collection...." A "collecting bank" is "any bank handling the item for collection...." § 4–105(d). In this case, MNB is the depositary bank and is also the only "collecting bank" that is relevant to this action. Because we need not distinguish between the liabilities of a "collecting bank" and those of a "depositary bank" in this case, we will refer exclusively to MNB as a "depositary bank" for the remainder of this opinion.

The "drawee bank" is the bank where the drawer of the check has its checking account. The drawee bank in this case is not a party to this action.

*Commercial Code,* 39 Okl.L.Rev. 669, 669 (1986). In the typical case, Titles 3 and 4 place ultimate liability for losses resulting from a forged indorsement upon the depositary bank because the depositary bank first accepted the check containing the forged indorsement.

Regardless of who is ultimately liable for such losses, the drawer must *initially* bear the loss "in the form of the debit to his account with the drawee bank." *Id.* at 671. The issues in this case focus on the means by which the drawer can seek to shift this loss to the depositary bank. Titles 3 and 4 explicitly provide one means by which the drawer can recover any losses suffered as a result of a forged indorsement. Because a check containing a forged indorsement is not "properly payable," the drawer can require the drawee bank to re-credit the drawer's account. *See* § 4–401(1) (allowing a bank to charge against a customer's account only those items which are "otherwise properly payable from that account"). The drawee bank can then proceed against the depositary bank for a breach of the depositary bank's warranty of title under § 4–207(1)(a).[3]

In addition to this remedy, some jurisdictions have allowed the drawer to sue a depositary bank for conversion or to bring suit under other common law causes of action such as money had and received or negligence. *Kelly v. Central Bank and Trust Co.,* 794 P.2d 1037 (Colo.App.1989) (allowing action for conversion to proceed when depositary bank accepted checks containing missing indorsement); *Underpinning, Inc. v. Chase Manhattan,* 46 N.Y.2d 459, 414 N.Y.S.2d 298, 298, 386 N.E.2d 1319, 1319 (1979) (allowing drawer to bring a conversion action when depositary bank accepted checks containing

---

**3.** In a few jurisdictions, the drawer has been allowed to bring an action directly against the depositary bank for breach of the warranty of title under § 4–207. *See Insurance Co. of No. Am. v. Purdue, Etc.,* 401 N.E.2d 708 (Ind.App.1980); *Sun 'n Sand, Inc. v. United California Bank,* 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (1978); *Insurance Co. of North Am. v. Atlas Supply Co.,* 121 Ga.App. 1, 172 S.E.2d 632 (1970). *But see* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code 603 n. 55 (2d ed.1980) (citing contrary case law). Because the warranty of title has not been raised by either party, we need not address it here.

forged restrictive indorsements and the checks were accepted in violation of the restrictive indorsement); *Sun 'n Sand v. United California Bank,* 21 Cal.3d 671, 148 Cal.Rptr. 329, 346, 582 P.2d 920, 937 (1978) (allowing drawer to bring a claim of negligence against a depository bank); *Commercial Credit Corp. v. Citizens National Bank,* 150 W.Va. 196, 144 S.E.2d 784 (1965) (finding that "the majority of cases hold that the drawer can sue the collecting or intermediary bank on implied contract for money had and received and omit suing the drawee bank, thus relieving the necessity of circuity of actions"); *see also G.F.D. Enterprises, Inc. v. Nye,* 37 Ohio St.3d 205, 525 N.E.2d 10 (1988) (recognizing that "the negligence cause of action is preserved" under the U.C.C., but denying recovery to a drawer in cases involving a forged *drawer's* signature).

Hartford maintains that "under Maryland law, the drawer of a check who retains title . . . may bring an action against a depository bank that wrongfully pays its proceeds." Hartford asserts that this result is mandated by our older case law, and that it has not been altered by Maryland's passage of the Uniform Commercial Code. In contrast, MNB contends that a drawer cannot sue a depository bank for conversion because the depository bank never handles the drawer's funds. Instead, MNB asserts, a drawer must recover its losses from the drawee bank, and the drawee bank is responsible for bringing a claim against the depository bank. To hold otherwise, according to MNB, would "eviscerate[ ] the careful allocation of rights and liabilities set forth in the Maryland Commercial Code."

### B

Before addressing these contentions, it is necessary to emphasize the differences between the present case and cases involving only forged indorsements. At this time, we need not consider whether a drawer can sue a depository bank for conversion when the depository bank accepts a check containing a non-restrictive forged indorsement. That issue is not properly before us for two reasons. First, Title 3 explicitly

precludes Hartford from recovering for any checks accepted by MNB that contained only a forged, non-restrictive indorsement. In addition, MNB would have failed to act reasonably and to properly obtain title to the checks even if all indorsements on those checks had been genuine.

■ Although a depositary bank generally must bear any loss resulting from its acceptance of a check containing a forged indorsement, § 3–405(1) shifts the loss to the drawer in certain cases of employee embezzlement. Section 3–405(1) provides that

[a]n indorsement by any person in the name of a named payee is effective if . . . [a] person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument; or . . . [a]n agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.

Because an indorsement signed by its embezzling employee is "effective" against the drawer, the drawer cannot recover from the drawee or depositary banks, and the drawer must bear any losses resulting from the employee's embezzlement.[4] For this reason, § 3–405(1) specifically precludes Hartford from holding MNB liable for its acceptance of checks containing indorsements forged by Carbaugh when MNB did not violate any restrictions placed on those indorsements.

■ In addition to the fact that § 3–405(1) prevents Hartford from recovering from MNB solely on the basis of forged

---

4. Section 3–405(1) forces the drawer to bear any loss resulting from forgeries perpetrated by the drawer's employees on the rationale that the drawer is in the best position to control the actions of its employees. As explained in the commentary to § 3–405,

[t]he principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee.

§ 3–405 cmt. 4.

indorsements, the propriety of MNB's conduct in this case does not depend upon the validity of the indorsements on any of the checks accepted by it. MNB's acceptance of checks in violation of restrictive indorsements or despite missing indorsements would have been improper even if none of the indorsements had been forged.

■ Even if all of the indorsements on the checks accepted by MNB had been valid, MNB could not claim the protected status of a "holder in due course" with respect to any of the checks at issue here. Under § 3–206(3), any bank that accepts a check containing a restrictive indorsement "must pay or apply any value given by him for ... the instrument consistently with the indorsement and to the extent that he does so he becomes a holder for value." To the extent that MNB failed to apply the proceeds of the checks accepted from Carbaugh consistently with the restrictive indorsements on those checks, it failed to become a "holder" regardless of indorsements' validity.

■ MNB also failed to become a "holder" of those checks written to joint payees when it accepted them with the indorsement of only one of the payees. "Holder" is defined as "a person who is in possession of ... an instrument ... drawn, issued or indorsed to him or his order or to bearer or in blank." § 1–201(20). Under § 3–116(b), an instrument payable to the order of two or more persons "may be negotiated ... only by all of them." Without proper negotiation, MNB could not perfect its title to the checks.[5] MNB, therefore, could not become a "holder" without the indorsements of all of the joint payees.

■ Finally, MNB could not have become a "holder" of those checks upon which "for deposit only to within payee only" and an account number had been stamped or typed.

---

5. "Negotiation is the transfer of an instrument in such form that the transferee becomes a holder." § 3–202(1). "Negotiation takes effect only when the indorsement is made and until that time there is no presumption that the transferee is the owner." § 3–201(3).

Although § 4–205(1) allows a depositary bank to supply a customer's missing indorsement and "a statement placed on the item by the depositary bank to the effect that the item was deposited by a customer or credited to his account is effective as the customer's indorsement," this provision would only allow MNB to supply Carbaugh's indorsement, since only Carbaugh was its customer. Because MNB could not supply the indorsements of the payees to whom the checks had been written, the checks were never effectively indorsed, and MNB could not become a "holder" of those checks.

Since MNB could not have become a "holder" of the checks accepted in violation of restrictive indorsements or accepted with missing indorsements, MNB could not claim the protection given to a "holder in due course" under Articles 3 and 4. *See* § 3–302. Under § 3–306, "[u]nless he has the rights of a holder in due course any person takes the instrument subject to ... all valid claims to it on the part of any person...." [6] Even if all of the indorsements on the checks at issue here had been genuine, therefore, MNB would still have failed to perfect its title to the checks, and would be subject to any valid claims against the proceeds that it collected.

### III

#### A

■ As to the issue of when a drawer can sue a depositary bank, "[t]he authorities are hopelessly divided." *Stone & Webster Engineering Corp. v. First National B. & T. Co.*, 345 Mass. 1, 184 N.E.2d 358, 361 (1962) [hereinafter *Stone & Webster*]. For our purposes, three leading decisions will suffice to illustrate and analyze the various approaches that may be taken in this area.

---

6. According to the official commentary, "[a]ll valid claims to it on the part of any person" includes not only claims of legal title, but all liens, equities, or other claims of right against the instrument or its proceeds. It includes claims to rescind a prior negotiation and to recover the instrument or its proceeds.

   § 3–306 cmt. 2.

In *Stone & Webster, supra,* the Supreme Judicial Court of Massachusetts held that a drawer can never bring an action against a depositary bank for conversion of a check containing a forged indorsement. In that case, Stone & Webster Engineering Corp. drafted checks payable to one of its creditors. Before the checks were delivered to the creditor, they were stolen by one of Stone & Webster's employees. The employee forged the creditor's indorsement on the back of the check and cashed the checks at the defendant bank. *Id.* 184 N.E.2d at 359. Although some of the indorsements were restrictive, the court made no distinction between those checks that were accepted by the depositary bank in violation of a restrictive forged indorsement and those accepted with a forged indorsement in blank. *See id.* at 361.

The court noted that the depositary bank was not a "holder" of the check because the check could not have been negotiated to the bank when the forged indorsements were " 'wholly inoperative' as the signatures of the payee." *Id.* Accordingly, the court "assume[d] that the collecting bank may be liable in conversion to a proper party. . . ." Because "no explicit provision in the Code purport[ed] to determine to whom the collecting bank may be liable," however, the court found that whether the *drawer* was a proper party "must be decided on our own law, which, on the issue we are discussing, has been left untouched by the Uniform Commercial Code." *Id.*

The court held that the drawer was not the proper party to sue because the drawer had no right to the checks themselves or their proceeds. Since the drawer would have had no right to present the checks for payment, the drawer's interest in the checks "was limited to the physical paper on which they were written, and was not measured by their payable amounts." *Id.* at 362. The drawer similarly had no interest in any proceeds that would have been gained by cashing the checks. *Id.* at 360. Thus, the drawer could not sue for conversion of the checks themselves.

The drawer's loss did not follow from its loss of the checks, however, but from the debit of its account by the drawee bank

when the checks were accepted from the depository bank. The drawer, therefore, alleged that the depository bank wrongfully deprived it of a credit in its bank account with the drawee bank. *Id.* at 360. The drawer lost this credit when the drawee bank took funds out of the drawer's account in order to pay the proceeds of the checks to the depository bank. *Id.* The court rejected this argument, finding that any amounts given to a depository bank by a drawee bank were in fact the funds of the drawee bank. Thus, the depository bank had no funds that belonged to the drawer. If the drawee bank wrongfully debited the account of the drawer, the drawer would have to recover them from the drawee bank, not the depository bank:

> [w]hen the defendant [depository bank] 'cashed' checks with its own funds, no legal harm befell the plaintiff. . . . The harm which befell the plaintiff was the charging of its account by the drawee bank. As has been noted above, the drawer has a cause of action, possibly subject to defenses, against that bank.

*Id.* at 364; *see also id.* at 360–61. If we adopt the reasoning used in *Stone & Webster*, therefore, Hartford will be unable to recover from MNB for any of the checks because any losses suffered by the Board are attributable to the drawee bank, not MNB.

Other courts have allowed a drawer to bring suit against a depository bank in only a few, very specific situations. In *Underpinning, Inc. v. Chase Manhattan,* 46 N.Y.2d 459, 414 N.Y.S.2d 298, 298, 386 N.E.2d 1319, 1319 (1979), the New York Court of Appeals allowed a drawer to sue a depository bank for conversion when it "accepts [a] check and pays out the proceeds in violation of a forged restrictive indorsement." In that case, one of the drawer's employees had created false invoices purportedly from firms with which the drawer did business. The employee prepared checks to pay the invoices and obtained the appropriate signatures from the drawer's officers. The employee then forged indorsements on the checks using stamps similar to those used by the named payees. The stamps contained restrictive indorsements such

as "for deposit only." The checks were then either cashed by the employee or deposited in savings accounts opened at various depositary banks in names other than those of the named payee-indorsers. After discovering the scheme, the employer brought suit against the depositary banks. *Id.* 414 N.Y.S.2d at 299, 386 N.E.2d at 1320.

At the outset of its discussion, the court enunciated the same view of a drawer's interest in the money debited from its account that was applied in *Stone & Webster:*

> Simply stated, the reason why a drawer is normally held to have no cause of action against a depositary bank which wrongfully paid over a forged indorsement, is that the depositary bank is not deemed to have dealt with any valuable property of the drawer.... In the typical forged indorsement case, the indorsement will be ineffective, and thus the check will not authorize the drawee bank to pay it from the drawer's account. Absent such authority, the drawee may not charge the drawer's account—and any payment made on the check is deemed to have been made solely from the property of the drawee, not the drawer.... Since the money received by the depositary bank from the drawee is the property not of the drawer, but rather of the drawee alone, nothing the depositary bank does with those funds can be considered a conversion of the drawer's property.

*Id.* 414 N.Y.S.2d at 300, 386 N.E.2d at 1321. The court also applied the rationale used in *Stone & Webster* to explain why the drawer had no interest in the checks themselves:

> [S]ince the drawer is not a holder, and could not present the check for payment, the drawer is normally considered as having no interest in the check. Moreover, since the check cannot be paid over a forged indorsement, the drawer is viewed as having no valuable interest in whatever right the check might otherwise be seen as transferring to the payee and to subsequent holders, for the simple reason that there exists no such right.

*Id.* In New York, therefore, a drawer could not sue a depositary bank for payment of a check containing a forged indorsement when that indorsement was ineffective to transfer title to the check and the proceeds could not have been properly debited from the drawer's account by the drawee bank.

In *Underpinning,* however, the forged indorsement was considered to be "effective" under § 3–405(1)(c) of New York's Commercial Code, which provided that "[a]n indorsement by any person in the name of a named payee is effective if . . . an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest." *Id.* 414 N.Y.S.2d at 301, 386 N.E.2d at 1322 (quotation omitted). Because the indorsement was "effective," the check was negotiable and the drawee bank acted properly in disbursing the funds to the depositary bank and debiting the drawer's account. Therefore, "the drawee is in fact paying out funds in which the drawer does have an interest and which may serve as the basis for an action against a depositary bank which has wrongfully obtained that money." *Id.* Noting that the UCC "places liability solely upon the bank which first takes the check with the restrictive indorsement," the court found that "[t]he depositary bank . . . was responsible for checking all restrictive indorsements, and is liable for payment made in violation thereof." *Id.* 414 N.Y.S.2d at 301, 386 N.E.2d at 1322.

Under the reasoning in *Underpinning,* MNB could be held liable for all of the checks accepted from Carbaugh in violation of a restrictive indorsement. As we discussed above, § 3–405(1) of our Commercial Law Article makes Carbaugh's signature effective as an indorsement in this case. Therefore, the drawee bank properly charged the drawer's account, and the drawer may sue the depositary bank for its wrongful acceptance of the check in violation of a restrictive indorsement. Were we to adopt *Underpinning,* however, MNB could not be held liable for the acceptance of the checks with missing indorsements. Because the stamp placed on the reverse of the checks by MNB was not effective as an

indorsement, the checks were not "properly payable" and the drawee bank would have been considered to have paid its own money to the depositary bank.

In *Sun 'n Sand, Inc. v. United California Bank*, 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (1978), the California Supreme Court defined a drawer's right to sue a depositary bank more broadly than Massachusetts or New York. *Sun 'n Sand* involved embezzlement by an employee of Sun 'n Sand who was responsible for preparing checks for signature by a corporate officer. Over three years, the employee made nine checks payable to the United California Bank (UCB), and obtained authorized signatures from the appropriate corporate officers under the belief that the checks represented small sums owed by the company to UCB. The employee then altered the checks by increasing the amount of each check, and presented the check to UCB for payment. Although UCB was the named payee, it permitted the employee to deposit the proceeds of the checks into her own personal account while UCB presented the checks to the drawee bank for payment.

Sun 'n Sand brought suit against UCB under various theories of liability, one of which was negligence. It asserted that "UCB breached its duty of care in permitting checks on which the bank was named as payee to be deposited in the personal account of Sun 'n Sand's employee." *Id.* 148 Cal.Rptr. at 344, 582 P.2d at 935. The California Supreme Court held that the drawer could bring a negligence action against the depositary bank because "the asserted wrong ... is not that UCB failed to intervene beneficially (nonfeasance) but rather that it affirmatively engaged in risk-creating conduct (misfeasance)." *Id.* Under these circumstances, UCB should have been alerted to the possible fraud:

> We agree that an attempt by a third party to divert the proceeds of a check drawn payable to the order of a bank to the benefit of one other than the drawer or drawee suggests a possible misappropriation. Accordingly, we conclude that Sun 'n Sand's allegations define circumstances sufficiently suspicious that UCB should have been alerted to the risk

that Sun 'n Sand's employee was perpetrating a fraud. By making reasonable inquiries, UCB could have discovered the fraudulent scheme and prevented its success.

*Id.* 148 Cal.Rptr. at 345, 582 P.2d at 936. Finding that "the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk," the court found that

[o]ur conclusion that UCB should have appreciated the indicia of misappropriation is, of course, nothing other than a determination that Sun 'n Sand's loss was reasonably foreseeable. We are not persuaded that commerce will be so impeded by a duty of inquiry in this context that we should depart from the fundamental principle that actors are liable for reasonably foreseeable losses occasioned by their conduct.

*Id.* 148 Cal.Rptr. at 346, 582 P.2d at 937. The court found that UCB had breached this duty when it accepted checks from the employee for deposit into the employee's personal account, even though UCB was the named payee. Were we to adopt the California Supreme Court's approach, MNB could be liable for accepting checks with missing indorsements or in violation of restrictive indorsements using similar reasoning.

## B

In Maryland, we have not addressed whether a drawer can sue a depositary bank after the passage of Maryland's version of the UCC. As we recently noted, however, where the Commercial Law Article does not "expressly provide for the allocation of loss," we "look to our prior cases and to the legislative intent behind the U.C.C. in determining where to allocate liability. . . ." *Bank of Glen Burnie v. Loyola*, 336 Md. 331, 337–38, 648 A.2d 453 (1994). Although not entirely clear of ambiguity, our prior cases appear to allow a drawer to sue a depositary bank in conversion when the bank accepts a check containing a forged indorsement and no existing payee has a superior claim to the check or its proceeds.

In *Nat. Union Bank v. Miller Rubber Co.*, 148 Md. 449, 129 A. 688 (1925), this Court recognized that a payee could recover from a depositary bank when the depositary bank cashes a check on a forged indorsement:

> There the collecting bank on the forged endorsement acquires no title whatever to the paper because the endorsement, its only source of title, is a nullity. It therefore is wrongfully in possession of the check and in equity and good conscience holds it for the payee. If, while in possession of it, it by means of the forged endorsement collects it, then it holds the proceeds of the collection in the same way for the payee, and that relationship creates a privity between it and the payee. And if the payee elects to ratify the collection of the check by the collecting bank he may recover from it the amount collected.

*Id.* at 455–56, 129 A. 688. While *Nat. Union Bank* provided a definitive statement of a *payee's* rights, however, it did not discuss the rights given to a drawer.

The right to sue a depositary bank in conversion was extended to drawers in certain circumstances by *John Hancock v. Fid.–Balto. Bank*, 212 Md. 506, 129 A.2d 815 (1957), and *Fid.–Balto. Bank v. John Hancock*, 217 Md. 367, 142 A.2d 796 (1958). In *John Hancock, supra,* 212 Md. at 508–09, 129 A.2d 815, an insurance company's employee filed claims on behalf of fictitious persons, collected checks payable to those fictitious persons from the insurance company, indorsed the checks by forging the names of the fictitious payees, and deposited the checks in various accounts at depository banks. The insurance company, the drawer of the checks, sued the depositary banks for conversion. *Id.* The trial court sustained the defendant banks' demurrers on the grounds that Massachusetts law applied. *Id.* at 510, 129 A.2d 815. Under Massachusetts law, checks made to fictitious payees were rendered payable to bearer, and the banks would have no liability. *Id.* at 514, 129 A.2d 815.

On appeal to this Court, the only issue was whether Maryland or Massachusetts law applied. The Court assumed that

"if the Maryland law be applicable and the checks were not payable to bearer, the indorsements would be forgeries for which the said banks would be responsible." Citing *Nat. Union Bank, supra,* 148 Md. at 455–56, 129 A. 688, for the proposition that the depositary banks would be liable under Maryland law, the Court made no distinction between the rights of payees and those of drawers. *See John Hancock, supra,* 212 Md. at 514–15, 129 A.2d 815. The Court held that the defendant banks' liability was governed by Maryland law.

*Fid.–Balto. Bank v. John Hancock, supra,* involved a second appeal in the same case. After losing at trial, the depositary banks appealed, directly raising the issue of whether the depositary bank was liable to the drawer of a check issued to a fictitious payee. The Court found that this issue had been raised and specifically decided in the earlier appeal:

> There we quoted from *Nat. Union Bank v. Miller Rubber Co.,* 148 Md. 449 [129 A. 688], to show that a payee of a check under similar circumstances as those presented here could bring suit and recover from a collecting bank. We were and are unable to discover any difference in principle between a payee and a drawer of a check under such circumstances.

*Fid.–Balto. Bank, supra,* 217 Md. at 371, 142 A.2d 796. At least in the circumstances presented in *Fid.–Balto Bank,* therefore, our predecessors have made no distinction between the rights of a drawer and payee to sue in conversion.

In *Levin v. Union National Bank,* 224 Md. 603, 168 A.2d 889 (1961), we gave a qualified endorsement of *Fid.–Balto. Bank's* holding:

> It was said in *Fidelity–Balto. Nat. Bank v. John Hancock Ins. Co.,* 217 Md. 367, 371, [142 A.2d 796], that a drawer likewise has an action [in conversion] against a collecting bank, although there is authority to the contrary.... Doubtless the question would depend upon whether the title to the check, or the proceeds, remained in the drawer, as it did in the *Fid.–Balto. Bank* case, *supra,* or passed to the true payee.

*Id.* at 608, 168 A.2d 889. Although we have recognized that other jurisdictions disagree, Maryland common law appears to allow a drawer to bring suit against a depositary bank for conversion in cases where the named payee has no interest in the check.

### C

We conclude that under Maryland common law, Hartford can bring an action to recover the Board's losses from MNB for those checks accepted with missing indorsements or in violation of restrictive indorsements. In reaching this conclusion, we reject the legal fictions employed in *Stone & Webster, supra,* and *Underpinning, supra.* At the same time, however, we need not determine whether a drawer has a general cause of action for negligence against a depositary bank, as was found in *Sun 'n Sand, supra.* Instead, we hold that under the facts of this case, MNB may be held liable in conversion to Hartford for those checks still in issue.

As we noted above, we need not address whether drawers in general may bring conversion actions against depositary banks that accept a check with a forged indorsement. Section 3–405(1) explicitly saves MNB from liability to Hartford simply for accepting checks from Carbaugh that contained only a forged indorsement. The checks at issue here were accepted despite obvious irregularities on the face and back of the checks themselves that prevented MNB from obtaining good title to the checks regardless of whether any indorsements were forged.

While we are unwilling to pronounce upon the rights of drawers in general, our prior decisions make it clear that the legal fiction underlying *Stone & Webster, supra,* and *Underpinning, supra,* has not been adopted in Maryland. Had our predecessors assumed that the drawee bank paid out its own funds to the depositary bank in *Fid.–Balto. Bank v. John Hancock, supra,* the result in that case would have been different. In that instance, we would have required the drawer to proceed against the drawee bank instead of the depositary bank.

It would be particularly inappropriate to adopt such a legal fiction in this case. As noted in *Underpinning, supra,* 414 N.Y.S.2d at 300–01, 386 N.E.2d at 1321–22, the forged restrictive indorsements were "effective" and those checks were properly paid by the drawee bank. In that instance, MNB received the Board's funds even if one were to assume that a drawee bank pays out its own funds in other cases where the forged indorsement was ineffective. Thus, MNB could be liable in conversion even if *Stone & Webster's* reasoning properly applies to other situations.

It would be similarly inappropriate to assume that the drawee bank paid out its own funds when it paid MNB the proceeds of the checks containing missing indorsements. MNB can properly accept a check from a customer that lacks the customer's indorsement and can properly supply the customer's indorsement. § 4–205(1). As found by the district court, some of the checks contained the statement "for deposit only to within payee only" as a purported indorsement. With respect to these checks especially, the drawee bank would have been unable to determine whether MNB properly accepted the check and supplied only its customer's indorsement. The drawee bank's actions in debiting the Board's account, therefore, even though improper, were taken at the request of and based upon representations made by MNB. It seems fair to conclude that the proceeds transferred from the Board's account to MNB were actually the Board's money.

We conclude, therefore, that upon presenting the checks for payment, MNB received money taken from the Board's account. When receipt of such money is inconsistent with the Board's rights to it, MNB may be liable in conversion. *See Interstate Insurance Co. v. Logan,* 205 Md. 583, 588–89, 109 A.2d 904 (1954) ("A 'conversion' is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it."). Under our common law, therefore, the drawer may bring an action against MNB for conversion under these facts.

### D

█ Maryland's common law, however, is not our sole consideration. We must also consider whether Maryland's adoption of the UCC mandates a change in that common law. Obviously, the Commercial Law Article controls when that statute explicitly contradicts pre-existing common law. In addition, even where there is no explicitly applicable statute in the Commercial Law Article, we hesitate to adopt or perpetuate a common law rule that would be plainly inconsistent with the legislature's intent in passing Titles 3 and 4 of that Article. We therefore must determine whether allowing Hartford to recover from MNB would be inconsistent with the explicit loss-allocation scheme provided in Titles 3 and 4.

Contrary to MNB's contentions, we find that allowing a drawer to sue a depositary bank to recover losses suffered when the depositary bank accepts checks with missing indorsements or in violation of restrictive indorsements is consistent with the UCC's loss-allocation scheme. The UCC's loss-allocation rules generally seek to place liability upon the party best situated to prevent the loss. *See Underpinning, supra,* 414 N.Y.S.2d at 302–03, 386 N.E.2d at 1323. Since the party who takes from the forger is generally in the best position to prevent a forged indorsement, the depositary bank is ultimately liable in most cases. The burden of loss, however, can be placed upon another interested party when a forgery results from that party's negligence. *See* § 4–406. Similarly, when the drawer could have most readily prevented the forgery from occurring, as when the forger is the drawer's employee, the drawer must bear the burden of the loss. § 4–405.

█ In the present case, MNB accepted checks that were clearly irregular on their face. Our holding in this case does not depend upon whether MNB was in the best position to detect or prevent a forged signature or whether the Board was in the best position to control its employees. For the checks at issue here, the forgery would have been prevented if MNB had simply determined that the check contained the

necessary signatures, whether valid or not, and complied with any restrictive indorsements written on the check itself. As stated by the New York Court of Appeals, "[a] restrictive indorsement ... imposes a new and separate duty upon a transferee to pay the check only in accord with the restriction.... [T]he failure to do so serves as a basis for liability independent of any liability which might be created by payment over a forged indorsement alone." *Underpinning, supra*, 414 N.Y.S.2d at 302, 386 N.E.2d at 1323. We apply the same reasoning to MNB's failure to ensure that all necessary signatures were present on the check. "Based on such a failure to follow the mandates of due care and commercially reasonable behavior, it is appropriate to shift ultimate liability from the drawer to the depositary bank." *Id.* 414 N.Y.S.2d at 303, 386 N.E.2d at 1324. MNB could most readily have prevented the fraud in this case simply by ensuring that the check was regular on its face and back.[7]

In this case, where the assignment of ultimate liability depends upon the propriety of actions taken by the depositary

---

7. MNB contends that our holding today "gives the *wrongdoer* the control to provide or deprive the drawer with a remedy against the depositary bank," a result which MNB "respectfully suggests would be bizarre and inequitable." (emphasis in original). MNB points to our conclusion in *Citizens v. Maryland Indus.*, 338 Md. 448, 463–64, 659 A.2d 313 (1995), where we found it "unjustifiable" to place a payee's "ability to recover entirely in the hands of the [embezzling] agent." We agree that a principal's ability to recover its losses generally should not depend upon the fortuity of the means by which an agent chooses to embezzle. This case, however, demonstrates that there are limits to this reasoning.

When a check manifesting clear indications of irregularity or potential fraud is presented for deposit, the depositary bank cannot ignore obvious warning signals on the grounds that those signals are within the embezzling employee's control. It was surely within Carbaugh's "control" to announce "I am depositing checks containing forged indorsements yet again" on each of his visits to MNB. Yet, there can be little doubt that MNB could not properly accept such checks for collection, knowing them to contain forgeries. Here, MNB accepted checks which were not properly negotiable, even though the checks' irregularities were apparent on their face and back because they were missing signatures or had explicit, restrictive indorsements. The fact that Carbaugh might have been more devious cannot shield MNB from liability resulting from its own wrongful acceptance of such checks.

bank, it makes no sense to require the drawer to sue the drawee bank. To allow Hartford to bring an action against MNB for conversion in this case does not conflict with the loss-allocation scheme provided in Titles 3 and 4 of the Commercial Law Article. We thus answer both certified questions in the affirmative, concluding that the drawer, in the circumstances of this case, may bring an action directly against the depositary bank to recover its losses.

*CERTIFIED QUESTIONS ANSWERED AS HEREIN SET FORTH; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.*

CHASANOW, J., concurs in the result only.