877 A.2d 1145

**FARMERS BANK OF MARYLAND, et al.**

v.

**CHICAGO TITLE INSURANCE COMPANY, et al.**

**No. 0160, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

July 7, 2005.

C. Edward Hartman, III, Annapolis, for Appellant.

Wayne T. Kosmerl, Annapolis, for Appellee.

Panel: HOLLANDER, ADKINS, JOHN J. BISHOP, JR., (Retired, Specially Assigned) JJ.

ADKINS, Judge.

In this case we study negligence and the economic damages rule, negotiable instruments and the loss allocation rules of the Uniform Commercial Code regarding drawers, drawees, and depositary banks. We decide that it is necessary to address the novel question of whether a drawer can sue a depositary bank in negligence, because the Uniform Commercial Code's

loss allocation rules are largely inapplicable. We decide that it can, under the particular circumstances of this case.

## FACTS AND LEGAL PROCEEDINGS

In November 1997, Mark Shannahan, a customer of Farmers Bank of Maryland ("Farmers"), refinanced his Annapolis home ("the property") through Armada Mortgage Corporation ("Armada"). First Equity Title Corporation ("First Equity"), an agent of Chicago Title Insurance Company,[1] conducted Shannahan's settlement. A later title examination revealed the existence of two liens on the property that had to be satisfied in order to give Armada first priority after refinancing. One such lien, the subject of this litigation, was an Indemnity Deed of Trust ("IDOT") granted by Shannahan for the benefit of Farmers.

Before settlement, First Equity received from Armada two payoff statements which had been completed by a loan assistant for Farmers. One payoff statement indicated the existence of a loan dated November 21, 1996, in the original "high credit" amount of $50,000.00, with a balance as of October 23, 1997, of $45,104.47. On this first payoff statement, the loan assistant made a circled notation of "2nd DOT" above the high credit amount. The second payoff statement indicated the existence of a line of credit loan dated March 25, 1970, in the original "high credit" amount of $40,000.00, with a balance as of October 23, 1997, of $40,760.83 ("line of credit debt"). On this second payoff statement, the loan assistant made a circled notation of "3rd DOT" above the high credit amount.

When comparing the title examination with the payoff statements, First Equity initiated an inquiry with the title examiner to determine the existence of the "3rd DOT". The title examiner reported that a review of the Land Records of Anne Arundel County did not reveal the existence of a third deed of trust. This report caused First Equity to mistakenly believe

---

1. For purposes of this appeal, we shall use "First Equity" to refer to Chicago Title Insurance Company, as well as its agent, First Equity Title Corporation.

that the balance of the debt secured by the IDOT was only $45,575.70. Neither the title examiner nor First Equity correctly read the language in the IDOT providing that the $40,000.00 line of credit Shannahan maintained at Farmers was also secured by the lien of the IDOT. First Equity believed that line of credit debt to be unsecured.

Accordingly, on December 1, 1997, First Equity issued a check in the amount of $45,575.70 ("Check 1") and mailed it directly to Farmers along with a copy of the first payoff statement and instructions to pay off the "2nd DOT". The letter accompanying Check 1 stated that "[t]he enclosed check is to pay this account in full." It did not request that the IDOT be released. It also did not mention the $40,760.83 line of credit.

Following settlement, First Equity delivered two checks to Shannahan: (1) a check made payable to Shannahan in the amount of $87,464.11 (representing Shannahan's "cash-out" from the refinancing)("cash-out check"); and (2) a check made payable to Farmers in the amount of $40,760.83 (representing the outstanding balance of the line of credit)("Check 2"). First Equity gave Check 2 to Shannahan along with a letter instructing Farmers to pay off, and then close out, the line of credit. This letter, unfortunately, was never delivered to Farmers.

On December 3, 1997, Shannahan took the cash-out check and Check 2 to the West Street branch of Farmers. Upon arrival at the bank, Shannahan deposited the cash-out check into his personal account at Farmers. In addition, Shannahan indorsed Check 2 and directed the bank to deposit that check into his personal account as well. Shannahan did not give Farmers First Equity's instructions that Check 2 be used to pay off, and then close out, the line of credit.

After the teller discussed the deposit of Check 2 into Shannahan's account with the bank manager, who in turn allegedly discussed the situation with a loan officer, Shannahan was allowed to deposit Check 2, made out to Farmers, into his personal account. Then Farmers placed its indorse-

ment on the back of Check 2, and the funds were subsequently withdrawn from First Equity's checking account at Allfirst Bank ("Allfirst"). Check 2 was deposited into Shannahan's account before Farmers negotiated Check 1.

Around July 1998, Farmers initiated foreclosure proceedings with respect to the IDOT, because the line of credit balance was in default.[2] At this time, First Equity learned that Farmers still had a lien on the property because, according to Farmers, Shannahan had not paid off the line of credit, which was secured by the IDOT. First Equity then notified Allfirst about Check 2 and requested that Allfirst recredit its account. Allfirst refused to do so.

First Equity subsequently filed a declaratory judgment action against Farmers and Allfirst in the Circuit Court for Anne Arundel County. Both banks filed a Counter–Complaint for Interpleader against First Equity. After a bench trial, the circuit court ruled in favor of First Equity and ordered Farmers to release the lien of its IDOT from the property. Farmers filed a timely appeal.

The circuit court also ruled that Allfirst was not liable for debiting funds from First Equity's checking account when it processed Check 2. First Equity filed a cross-appeal on this issue.

Appellant Farmers asks us to decide

I. Whether the lower court erred in finding that Farmers negligently failed to apply the proceeds of a check issued by First Equity and made payable to Farmers to an outstanding balance on a line of credit, absent a finding of a duty owed by Farmers to First Equity[.]

II. Whether the lower court erred in failing to consider whether First Equity's contributory negligence barred the relief it obtained.

Appellee/cross-appellant First Equity asks us to decide:

---

**2.** Armada, the refinancing lender, also desired to foreclose, as the mortgage was in default.

III. Whether the lower court erred in finding that Allfirst Bank did not violate Md.Code (1975, 2002 Repl.Vol.), section 4–401 of the Commercial Law Article ("UCC") when it debited Check 2 from First Equity's account.

Appellant Farmers and cross-appellee Allfirst filed separate briefs, but make no claims against each other. Both are represented by the same counsel.

## CIRCUIT COURT'S DECISION

After a trial on the merits, the circuit court made the following findings and conclusions:

Although Shannahan was in possession of [Check 2,] the instrument was payable to [Farmers] and not to bearer. Therefore, Shannahan was not a holder of the instrument and thus was unable to properly negotiate the check to the credit of his personal account.

MD Code Ann., Com. Law I § 3–205(d) provides: "Anomalous indorsement" means an indorsement made by a person who is not the holder of the instrument. An anomalous indorsement does not affect the manner in which the instrument may be negotiated." ... [T]he court will disregard Shannahan's placement of his signature as an indorsement and view [check 2] as if Shannahan had not attempted to negotiate it. As such, [Farmers] placed its own indorsement on the back of [Check 2] as it negotiated it to Allfirst Bank. Allfirst correctly dispersed the funds to [Farmers] who then permitted these funds, intended for [Farmers], to be directed to Shannahan's account. Thus, [Farmers] did accept the check from First Equity in the amount of $40,760.83 and then extended a payment to Shannahan in the same amount.

The court concludes that **[Farmers] negligently failed to apply the funds to Shannahan's outstanding balance of $40,760.83** on the line of credit also referred to in the payoff statement from Farmers as the 3rd DOT. The court finds that the delivery by First Equity of [Check 1] to [Farmers] by mail combined with the delivery by Shannahan of [Check

2] constitutes a pay-off in full of the Farmers IDOT and [Farmers] is required to release the IDOT in accordance with the provisions of Section 7–106 of the Real Property Article of the Code. (Emphasis added.)

We shall sustain the trial court's ruling that Farmers was negligent in its handling of Check 2. We hold that the court erred, however, in failing to consider the contributory negligence of First Equity, and in resting its decision on Md.Code (1974, 2003 Repl.Vol.), section 7–106 of the Real Property Article ("RP")(authorizing cause of action against lienholder for its failure to release lien whenever full payment is made and a release is requested in writing).[3] Finally, we affirm the trial court in its holding that First Equity could not recover against Allfirst because the latter did not violate UCC section 4–401 when it charged Check 2 against First Equity's account. This is so because no signature on Check 2 was forged, and no indorsement was missing. We explain our reasoning in the sections that follow.

## DISCUSSION

### I.

### First Equity's Claim Against Farmers in Negligence

██ Farmers contends that First Equity cannot recover against it in negligence because Farmers had no duty to First Equity. There are four elements in a cause of action for negligence: a duty owed to the plaintiff, a breach of that duty, harm caused by that breach, and damages. *See Jacques v. First Nat'l Bank*, 307 Md. 527, 531, 515 A.2d 756 (1986). First Equity candidly acknowledges that it "has not been able to locate any decision by [either Maryland appellate court] determining whether a drawer of a check has a general cause of action for negligence against a depositary bank." We are thus required to examine the novel and thorny question of whether

---

**3.** These issues are discussed, *infra,* in Sections II and III, respectively.

a depositary bank can be liable in negligence to its non-customer drawer.[4]

Although we sustained a negligence action by a drawer against a bank in *Bank of So. Md. v. Robertson's Crab House, Inc.*, 39 Md.App. 707, 715–16, 389 A.2d 388 (1978), that case does not resolve this issue because the drawer was a customer of the depositary bank. In *Robertson's*, the bank accepted a check from the drawer plaintiff payable to the bank, and deposited the proceeds into the presenter's personal account. The presenter was an employee of the drawer. We concluded that the bank had a duty of ordinary care to the drawer because it was the bank's **customer**. *See id.* at 713, 389 A.2d 388. There was no discussion of whether this duty extended to non-customer drawers.

There is a split of authority in other states on the issue of whether a depositary bank may be liable in negligence to a non-customer drawer for failure to exercise ordinary care in

---

4. The drawer of a check, defined by Md.Code (1975, 2002 Repl.Vol.), section 3–103(a)(3) of the Commercial Law Article ("UCC"), as "a person who signs or is identified in a draft as a person ordering payment," is the person or entity who, in layman's terms, "writes" the check. Here, the drawer is First Equity, because it wrote the check to Farmers. The drawee of a check, defined by UCC section 3–103(a)(2) as "a person ordered in a draft to make payment," is the person or entity required to "pay" the check, and is generally the bank where the drawer holds an account. Allfirst is the drawee in this case. The payee of a check is the person or entity the drawer intends to receive the money. Farmers is the payee of Check 2.

A depositary bank is "the first bank to take an item even though it is also the payor bank unless the item is presented for immediate payment over the counter." UCC § 4–105. Thus, Farmers, as the first bank to take Check 2, is the depositary bank. The Official Comment 1 to section 4–105 explains:

The definitions in general exclude a bank to which an item is issued, as this bank does not take by transfer except in the particular case covered in which the item is issued to a payee for collection, as in the case in which a corporation is transferring balances from one account to another. Thus, the definition of "depositary bank" does not include the bank to which a check is made payable if a check is given in payment of a mortgage. This bank has the status of a payee[.]

Farmers was the payee, but treated Check 2 as a depositary bank, and both parties refer to it as such. We shall sometimes refer to Farmers as a depositary bank, and sometimes as a payee, depending on the context.

handling checks. Cases holding that the depositary bank may be liable include: *Wymore State Bank v. Johnson Int'l Co.*, 873 F.2d 1082, 1087 (8th Cir.1989)(holding that a non-customer drawer has standing to sue depositary bank in negligence); *Progressive Casualty Ins. Co. v. PNC Bank, N.A.*, 73 F.Supp.2d 485, 489 (E.D.Pa.1999)(refusing to grant a defendant bank's motion to dismiss non-customer drawer's negligence suit); *Sun 'n Sand, Inc. v. United Cal. Bank*, 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920, 936–37 (1978), *abrogated in part by statute on other grounds as recognized in Lee Newman, M.D., Inc. v. Wells Fargo Bank*, 87 Cal.App.4th 73, 104 Cal.Rptr.2d 310 (2001)(drawer's loss was reasonably foreseeable); *Kaiser–Georgetown Community Health Plan, Inc. v. Bankers Trust Co. of Albany, N.A.*, 110 Misc.2d 320, 321–22, 442 N.Y.S.2d 48 (N.Y.Sup.Ct.1981)(granting summary judgment to non-customer drawer against depositary bank); *Allis Chalmers Leasing Servs. Corp. v. Byron Ctr. State Bank*, 129 Mich.App. 602, 341 N.W.2d 837, 839 (1983)(per curiam)(affirming grant of summary judgment to non-customer drawer against depositary bank). *Cf. Murray v. Bank of Amer., N.A.*, 354 S.C. 337, 580 S.E.2d 194, 198 (Ct.App.2003)(finding bank has general duty of care to non-customer). For cases denying recovery by non-customer drawer against a depositary bank, *see, e.g., Bank Polska Kasa Opieki, S.A. v. Pamrapo Savings Bank, S.L.A.*, 909 F.Supp. 948 (D.N.J.1995); *Great Lakes Higher Educ. Corp. v. Austin Bank of Chicago*, 837 F.Supp. 892 (N.D.Ill.1993); *Ramsey v. Hancock*, 79 P.3d 423 (Utah Ct.App.2003).[5]

In the widely cited 1978 case, *Sun 'n Sand*,[6] the California Supreme Court addressed a drawer's claim of negligence

---

**5.** For a general discussion of bank liability for allowing diversion of checks drawn to it, *see* Boyd J. Petersen, Annot., *Liability of Bank for Diversion to Benefit of Presenter or Third Party of Proceeds of Check Drawn to Bank's Order by Drawer Not Indebted to Bank*, 69 A.L.R.4th 778 (2004).

**6.** This case was cited with approval by our Court of Appeals in *Hartford Fire Ins. Co. v. Md. Nat'l Bank, N.A.*, 341 Md. 408, 418, 671 A.2d 22 (1996). We discuss the Court's treatment of *Sun 'n Sand, infra.*

against a depositary bank for allowing a check payable to the bank to be deposited in the personal account of the presenter, who was the drawer's employee.

The court described the balancing of policy considerations that is required to decide whether a duty should be imposed:

> The most important of these ... include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

*Sun 'n Sand*, 148 Cal.Rptr. 329, 582 P.2d at 936 (citations omitted).

In doing that balancing, the court emphasized that foreseeability was the foundation for finding liability, and lack of foreseeability would set limits thereon:

> Our conclusion that [the bank] should have appreciated the indicia of misappropriation is, of course, nothing other than a determination that [the drawer's] loss was reasonably foreseeable. We are not persuaded that commerce will be so impeded by a duty of inquiry in this context that we should depart from the fundamental principle that actors are liable for reasonably foreseeable losses occasioned by their conduct. The duty is narrowly circumscribed: it is activated only when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit. Moreover, the bank's obligation is minimal. We hold simply that the bank may not ignore the danger signals inherent in such an attempted negotiation. There must be objective indicia from which the bank could reasonably conclude that the party presenting the

check is authorized to transact in the manner proposed. In the absence of such indicia the bank pays at its peril. *Id.* 148 Cal.Rptr. 329, 582 P.2d at 937.[7]

The opinion of the Seventh Circuit in *Travelers Cas. and Sur. Co. of Am. v. Wells Fargo Bank, N.A.*, 374 F.3d 521, 528 (7th Cir.2004), echoed themes from *Sun 'n Sand* in holding that a depositary bank owes a duty to a drawer who is not its customer. Treating Charles Schwab, a brokerage firm, as a bank, Judge Posner, writing for the court, first considered the potential benefit to the community that would result if the duty were imposed:

> The common law of Illinois as of other states requires a bank, if someone tries to deposit a check made out to it in his own account, to exercise due care to make sure that the drawer (the third party) intended the depositor to receive the drawer's money.... The danger is great in such a case that the depositor merely found, stole, or forged the check. **The risk of his getting away with such fraud is reduced if the bank has a duty to check with the drawer or take other steps to make reasonably sure that the deposit is authorized.**

*Id.* at 525–26 (citations omitted and emphasis added).

Judge Posner next emphasized the ease with which the bank's duty could be fulfilled:

> [The bank] should have tried to find out from [the drawer] whether the check had been authorized. Although [the drawer's] check listed no address or phone number, only a P.O. box number in Milwaukee, it would have taken no more than a minute to look up [the drawer's] phone number and place a call.... Alternatively, it could have warned [the drawee] of the unusual deposit; the warning doubtless would have impelled [the drawee] to check the matter with its customer, in order to avoid liability. [The bank] did

---

7. In Maryland, the responsibility as between a depositary bank and the drawer for fraudulent indorsements by the drawer's employee is now governed, in part, by UCC section 3–405.

nothing and there is no evidence that, had it made a reasonable effort, the effort would have been fruitless. [The bank] violated its duty of care to [the drawer].

*Id.* at 527. Cautiously limiting a bank's duty, Judge Posner recognized that a minimal effort by the bank to obtain information might be sufficient even if unsuccessful:

If having [called the drawer,] [the bank] had found itself entangled in an endless automated phone menu or otherwise unable to get through to a responsible employee of the company in a reasonable amount of time and get a prompt answer to its query, its duty of care might have been satisfied.

*Id.*

While we find persuasive the reasoning in *Sun 'n Sand* and *Travelers,* we must carefully scrutinize whether the action can pass muster under Maryland negligence law. To do so we must examine two important Maryland cases: *Jacques,* 307 Md. 527, 515 A.2d 756, and *Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 762 A.2d 582 (2000)("*Walpert* ").

*Jacques,* a leading case on the subject of tort duty, is cited by both First Equity and Farmers. The issue presented in *Jacques* was "whether a bank that has agreed to process an application for a loan owes to its customer a duty of reasonable care in the processing and determination of that application." *Id.* at 528, 515 A.2d 756. The Court of Appeals concluded that such duty existed. *See id.* Although our issue here is quite different, the *Jacques* Court's analysis of duty and the "economic loss rule" in the banking context is instructive.

Judge McAuliffe, writing for the Court of Appeals, explained that "[t]he duty element in a negligence action is 'an obligation to which the law will give effect and recognition to conform to a particular standard of conduct toward another.'" *Id.* at 532, 515 A.2d 756 (citation omitted). It is " 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.'" *Id.* at 533, 515 A.2d 756 (citation omitted). The

Court additionally explained why a plaintiff with a claim for economic loss must meet a higher burden:

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of **economic loss only,** courts have generally required an **intimate nexus** between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.

*Id.* at 534, 515 A.2d 756 (citations and footnote omitted, emphasis added).

To illustrate the perimeters of negligence liability when only economic loss is involved, the *Jacques* Court examined two early leading cases from New York: *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), and *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). In *Glanzer,* the New York Court of Appeals held that "a public weigher of beans was liable to the buyer of the beans for negligence in the weighing, notwithstanding that the weigher had been engaged and paid only by the seller." *Jacques,* 307 Md. at 535, 515 A.2d 756. This was because the "buyer, although having no contract with the weigher, was the known and intended beneficiary of the contract between the seller and the weigher, and therefore a beneficiary of the duty owed by the weigher." *Id.*

On the other hand, in *Ultramares,* the New York court held that a "public accountant who carelessly prepared and certified a balance sheet for a corporation could not be held liable in negligence to a factor who made loans to the corporation in reliance on the balance sheet." *Jacques,* 307 Md. at 536, 515 A.2d 756. The New York court distinguished *Glanzer* from *Ultramares* "on the basis that there was no 'contractual relation, or even one approaching it, at the root of any duty

that was owing from the defendants . . . to the **indeterminant class of persons** who . . . might deal with the [corporation] in reliance on the audit.' " *Id.* (quoting *Ultramares,* 174 N.E. at 446)(emphasis added).

We view this distinction as meaningful in this case because, when Farmers deposited Check 2's proceeds into Shannahan's account, it knew who the drawer was, knew that the drawer owed it no money, and accepted the check from that drawer. Thus, in concluding that Farmers had a duty to First Equity, we would not be creating a duty to an "indeterminant class of persons."

Imposing a duty is also justified by the public nature of a bank. The *Jacques* Court explained that a "duty might arise from the public nature of defendant's calling[.]" *Jacques,* 307 Md. at 533, 515 A.2d 756. The Court explained the public character of a bank:

The banking business is affected with the public interest. Traditionally banks and their officers have been held to a high degree of integrity and responsiveness to their public calling. . . . [T]he requirements imposed by the Maryland Legislature upon state banks illustrate this State's policy concerning the banking industry. Unlike most other corporations, in Maryland a state bank may not be chartered until there has been an investigation by a state official and a determination that "[t]he character, responsibility, and general fitness of the incorporators and directors named in the articles command confidence and warrant belief that the business of the proposed commercial bank will be honestly and efficiently . . . and [that] [a]llowing the proposed commercial bank to engage in business . . . [w]ill promote public convenience and advantage." . . . The recognition of a tort duty of reasonable care under [these] circumstances . . . is thus consistent with the policy of this State . . . and reasonable in light of the nature of the banking industry and its relation to public welfare.

*Id.* at 542–43, 515 A.2d 756 (citations omitted).

Like the brokerage firm in *Jacques,* Farmers qualifies as an institution "invested with enormous public trust" and "affected

with the public interest." *See id.* We concede, though, a significant difference between this case and *Jacques*. There, the Court found that there was a contract between the bank and the plaintiffs who applied for the loan, whereas here there is none.[8] The *Jacques* Court left for future decisions the question of what circumstances might qualify as a "[contract] equivalent."

Fourteen years later, Chief Judge Bell, writing for the Court of Appeals in *Walpert*, 361 Md. 645, 762 A.2d 582, provided a partial answer to this question. *Walpert* involved the issue of whether a certified public accounting firm that prepared an audited financial statement for its corporate client had a duty of ordinary care to a person who loaned money to that client in reliance on the defendant's work. Chief Judge Bell undertook an extensive analysis of "the nature of the relationship required to establish a duty of care . . . in which economic damages only were incurred." *Id.* at 666, 762 A.2d 582.

Although the Court did not abandon the terms "intimate nexus," and "[contract] equivalent," it distanced itself from these concepts. In doing so, the Court clarified the privity issues discussed in *Jacques*. Reviewing *Jacques* and the cases it relied on, the Court focused on foreseeability rather than privity or its equivalent:

> [T]he rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct . . . resulting in economic damages emerges: to avoid "liability in an indeterminate amount for an indeterminate time to an indeterminate class." Stated differently, **the reason for the [privity] requirement is to limit the defendant's**

---

8. The Court explained the contract:

> The Bank made at least two express promises to the Jacques. It agreed first to process their loan application and second to "lock in" the interest rate of 11⅞% for a period of ninety days. . . . [T]hese promises were supported by a valid consideration [and therefore] were enforceable.

*Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 537, 515 A.2d 756 (1986).

**risk exposure to an actually foreseeable extent,** thus permitting a defendant to control the risk to which the defendant is exposed. It was that concern that was being addressed by the *Jacques* Court when it juxtaposed *Glanzer* and *Ultramares* and stressed doubly that the Jacqueses were not strangers to the loan transaction and that the Bank promised the Jacqueses to process their loan application and to lock in a certain rate of interest for a period of time.

*Walpert,* 361 Md. at 671, 762 A.2d 582 (citations and footnote omitted; emphasis added).

Further signaling that "contractual privity or its equivalent" is not essential to the imposition of duty, the Court explained:

While the *Ultramares* court was clear in its statement of its position on the unfairness of imposing on the defendants an indeterminate liability, to an indeterminate class of people, for an indeterminate class of people, for an indeterminate period of time, by contrasting the facts in that case with those in *Glanzer,* in which the third party was the "end and aim" of the transaction, **there may have been created a false impression that its holding requires a contractual privity or that of a third party beneficiary.** Certainly, *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985) and other subsequent [New York] cases make clear that *Ultramares* does not require strict privity or third party beneficiary status as a condition to third party suits against accountants.

*Id.* at 674 n. 12, 762 A.2d 582. (citations omitted and emphasis added).

The *Walpert* Court directed us to adjust our lens for viewing *Ultramares* and *Glanzer,* from focusing on the **relationship** between the plaintiff and defendant, to assessing the **reasonable expectations** of the defendant:

*Ultramares,* in distinguishing *Glanzer,* gave greater emphasis to the contractual analysis by which the *Glanzer* court indicated, albeit with circuitousness, the case could be ex-

plained. That explanation of the distinction between the cases was also the focus of *Jacques*. Thus, our reference in *Jacques* to "the contractual relation" in discussing *Ultramares* may suggest that, in order to find a duty, there must be the presence or absence of a contractual relationship. As we have seen, however, the relationship between the plaintiffs and the defendant in *Glanzer* was such that **the defendant knew both the purpose for which its work product was to be used**—to set the amount of payment due—and if not the identity of the final user, the specific class of persons who could and would rely on that work product. That knowledge needs to be contrasted with that possessed by the defendant in *Ultramares*, who knew only generally that the information it provided would be relied upon by others.

*Id.* at 685, 762 A.2d 582 (emphasis added).

Yet the Court of Appeals declined to fully abandon the "privity equivalent" or "near privity requirement" of *Ultramares*. Relying heavily on *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1984), it cautioned:

Elucidating *Ultramares*, the Court of Appeals of New York reiterated the privity equivalent or near privity requirement in [Credit Alliance Corp.], in the process, clarifying the test of elements a plaintiff must establish: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Walpert*, 361 Md. at 675–76, 762 A.2d 582 (footnote omitted).

In sum, what we distill from *Walpert's* interpretation of *Jacques* and the New York cases is that the nexus requirement may not be as close as the word "intimate" would suggest, and to determine whether it is met, we must focus on

the defendant's knowledge. Applying this lesson, we conclude that Farmers had a sufficient nexus to First Equity to justify imposition of a tort duty to handle Check 2 with ordinary care. Several factors support this conclusion.

First, Farmers received a sizable check payable to Farmers from an entity that was not indebted to it, with no direction as to its purpose. This does not occur in the normal day-to-day banking transaction. Farmers had the option of declining to accept Check 2 without instruction from the drawer as to why it was the payee. So, unlike the *Ultramares* accountant, who did not even know who relied on its audit work, Farmers made a conscious decision to accept First Equity's check for collection. In doing so, Farmers pleased its customer, Shannahan, and also earned more profit because interest would continue to accrue on the loan.

Second, the drawer of the check was a title company, *i.e.*, a company in the business of performing title searches, holding settlements involving real property, and issuing title policies that insure against title defects, including the priority of a lender's lien on real property. Shannahan had outstanding loans to Farmers secured by real property. Further, Farmers had received a "payoff request" from Armada, the new lender (to whom First Equity would issue a lender's title policy). Farmers had replied to that request identifying its two secured loans and stating the amount due.[9] These factors, taken together, suggest that Farmers knew, or should have known, that there was a risk that First Equity was expecting the proceeds of the check to pay off Shannahan's indebtedness to Farmers secured by the IDOT, thus clearing the title, rather than to place the proceeds in his account. Farmers' knowledge and conduct fall squarely within the fundamental negligence principle quoted in *Hartford Fire Ins. Co. v. Md. Nat'l Bank, N.A.*, 341 Md. 408, 424, 671 A.2d 22 (1996)("*Hartford* "), that "actors are liable for reasonably fore-

---

9. Farmers identified this amount due as of November 14, 1997, and gave a "per diem" amount to add to that figure, so the recipient could calculate the amount due on the exact settlement date.

seeable losses occasioned by their conduct." (Citation omitted).

## The Court Of Appeals' Decision In *Hartford*

■ In making our decision that Farmers could be liable in negligence, it is appropriate that we consider the history of Maryland's treatment of a bank's responsibilities and a drawer's remedies other than negligence, when loss is incurred as the result of a forged signature or similar event. Maryland has recognized for over 75 years that a depositary bank has a duty to inquire as to the right of a customer to use a check for his own benefit when the check was payable to someone else, such as his employer. *See Nat'l Union Bank of Md. v. Miller Rubber Co. of N.Y.*, 148 Md. 449, 129 A. 688 (1925)(holding depositary bank liable to payee in conversion when it credited check proceeds payable to a manufacturer to the personal account of a distributing agent for that manufacturer). This duty rests in part on the depositary bank's position as the one best able to detect forgery. *See Hartford*, 341 Md. at 429, 671 A.2d 22. ("Since the party who takes from the forger is generally in the best position to prevent a forged indorsement, the depositary bank is ultimately liable in most cases"). *See also* 6 *Anderson on the Uniform Commercial Code* § 3–404:5(b) (2004).

Although the plaintiff in *National Union* was the payee, the "right to sue a depositary bank in conversion was extended to drawers in certain circumstances[.]" *Hartford*, 341 Md. at 425, 671 A.2d 22 (citing *John Hancock v. Fid.-Balto. Bank*, 212 Md. 506, 129 A.2d 815 (1957) and *Fid.-Balto. Bank v. John Hancock*, 217 Md. 367, 142 A.2d 796 (1958))("We ... are unable to discover any difference in principle between a payee and a drawer of a check under such circumstances"). The Court in *Hartford* declined to adopt the "legal fiction" advanced in the seminal Massachusetts case, *Stone & Webster Eng'g Corp. v. First Nat'l Bank & Trust Co.*, 345 Mass. 1, 184 N.E.2d 358 (1962)(*"Stone"*) that

the drawer was not the proper party to sue because the drawer had no right to the checks themselves or their

proceeds. Since the drawer would have had no right to present the checks for payment, the drawer's interest in the checks "was limited to the physical paper on which they were written, and was not measured by their payable amounts."

*Hartford,* 341 Md. at 419, 671 A.2d 22 (citing *Stone,* 184 N.E.2d at 362). Because the *Hartford* Court concluded that the plaintiff drawer had a cause of action in conversion, it was unnecessary to decide whether the plaintiff also had a cause of action for negligence. *See id.* at 427, 671 A.2d 22.

### UCC Section 3–420

But, within the year, the legislature's adoption of UCC section 3–420 abolished a drawer's common law action for conversion and adopted the rule of *Stone.*[10] Official Comment 1 to this section explains the reason for this change:

> There is no reason why a drawer should have an action in conversion. The check represents an obligation of the drawer rather than property of the drawer. The drawer has an adequate remedy against the payor bank for recredit of the drawer's account for unauthorized payment of the check.

The UCC does not supplant all common law causes of action relating to negotiable instruments. Section 1–103 provides: "Unless displaced by the particular provisions of [this Act], the principles of law and equity . . . shall supplement its provisions[.]" In deciding whether a common law action for negligence should exist, however, we must consider the implications of section 3–420. As the *Hartford* Court observed:

> Maryland's common law . . . is not our sole consideration. We must also consider whether Maryland's adoption of the UCC mandates a change in that common law. Obviously

---

**10.** In pertinent part, UCC section 3–420 provides: "An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument[.]" " 'Issuer' . . . means a maker or drawer of an instrument." UCC § 3–105(c).

the Commercial Law Article controls when that statute explicitly contradicts pre-existing common law. In addition, even where there is no explicitly applicable statute in the Commercial Law Article, we hesitate to adopt or perpetuate a common law rule that would be **plainly inconsistent** with the legislature's intent[.] ... We therefore must determine whether allowing [the drawer] to recover from [the bank] would be inconsistent with the explicit loss-allocation scheme provided in Titles 3 and 4.

*Hartford,* 341 Md. at 429, 671 A.2d 22 (emphasis added).

Applying this standard, we must decide whether a drawer's action in negligence against a depositary bank should exist when a suit for conversion based on the same alleged malfeasance or nonfeasance does not. In other words, is a drawer's suit in negligence "plainly inconsistent" with the legislature's intent in adopting UCC section 3–420?

We first examine the legislative purpose in abolishing drawer suits against depositary and collecting banks for conversion. If the legislative policy for eliminating drawer conversion claims against a depositary or collecting bank would be "plainly inconsistent" with this negligence action, that could have negative implications for First Equity's action against Farmers. The Official Comment 1 to section 3–420 offers some guidance on this point:

Under former Article 3, the cases were divided on the issue of whether the drawer of a check with a forged indorsement can assert rights against a depositary bank that took the check. The last sentence of Section 3–420(a) resolves the conflict by following the rule stated in [*Stone* ]. There is no reason why a drawer should have an action in conversion. The check represents an obligation of the drawer rather than property of the drawer. **The drawer has an adequate remedy against the payor bank for recredit of the drawer's account for unauthorized payment of the check.** (Emphasis added.)

Thus, in abolishing the drawer's conversion action, the legislature **assumed** that the drawer has a cause of action

against the drawee, and therefore the conversion action was unnecessary. As we discuss in Section IV, First Equity has no cause of action against Allfirst, the drawee. This suggests that recognizing a negligence cause of action against Farmers would not be "plainly inconsistent."

The Official Comment's mention of *Stone* adds to our understanding of the legislative rationale. The *Stone* Court rejected a drawer's conversion claim against a depositary bank:

> An action by the drawer against the collecting bank might have some theoretical appeal as avoiding circuity of action. It would have been in the interest of speedy and complete justice had the case been tried with the action by the drawer against the drawee and with an action by the drawee against the collecting bank. So one might ask: If the drawee is liable to the drawer and the collecting bank is liable to the drawee, why not let the drawer sue the collecting bank direct? We believe that the answer lies in the applicable defen[s]es set up in the Code.

> The drawer can insist that the drawee recredit his account with the amount of any unauthorized payment. . . . But the drawee has defen[s]es based upon the drawer's substantial negligence, if 'contributing,' or upon his duty to discover and report unauthorized signatures and alterations. . . . Then, if the drawee has a valid defen[s]e which it waives or fails upon request to assert, the drawee may not assert against the collection bank or other prior party presenting or transferring the check a claim which is based on the forged instrument. . . . If the drawer is allowed . . . to sue the collecting bank, the assertion of the defen[s]es, for all practical purposes, would be difficult. The possibilities of such a result would tend to compel resort to litigation in every case involving a forgery of commercial paper. It is a result to be avoided.

*Stone*, 184 N.E.2d at 362–63 (citations and footnote omitted). We discern from this opinion two reasons for abolition of a drawer's conversion action: (1) the defenses of the drawee should be available to benefit the collecting bank, which had

no banking relationship with the drawer; (2) the drawer's suit against its drawee will trigger negotiations between the drawee and the collecting bank, which will enhance the prospect of settlements, and reduce litigation.

As stated in the Official Comment to section 3–420, both of these reasons rest on the assumption that the drawer has a cause of action against the drawee for an improper payment and charge against his account based on the same facts. Because, like the trial court, we decide in Section IV that First Equity does not have such an action, the *Stone* reasoning should not apply here. Accordingly, allowing First Equity's negligence action against Farmers to proceed is not "plainly inconsistent" with UCC section 3–420.

### Our Decision In *Simmons v. Lennon*

Farmers argues that allowing a negligence claim here is inconsistent with our decision in *Simmons v. Lennon*, 139 Md.App. 15, 773 A.2d 1064 (2001). There we rejected a drawer's claim that a payee negligently failed to detect that the check had been forged by the drawer's employee, Ms. Campbell. *See id.* at 40–41, 773 A.2d 1064. The drawer, Simmons, was a lawyer who employed Ms. Campbell as his secretary. The drawee, Lennon, was a retired police officer who worked as a private process server for Simmons, and was a friend of Campbell. When Lennon agreed to sell an automobile to Campbell for $22,000, Campbell paid for the vehicle, in part, with a $13,000 check, payable to Lennon, drawn on an escrow account Simmons held at a bank. Campbell forged Simmons's signature on the check. Lennon cashed the check, as well as another check from Campbell, and transferred title to the vehicle to her.

More than fifteen months later, Simmons discovered that Campbell, in concert with his outside bookkeeper, had been embezzling funds from his accounts for over two years, and had taken $109,362 in total. Simmons sued Lennon, asserting conversion and negligence based on his cashing the $13,000 check. He contended that Lennon "knew or should have known" that the $13,000 check was forged because the words

"escrow account" were printed on the check, and because Lennon was familiar with Simmons's signature. The circuit court granted Lennon's motion for summary judgment on the negligence count because Lennon owed Simmons no duty to warn him that Campbell had forged an escrow check.

On appeal, we affirmed that ruling. Judge Salmon, writing for this Court, distilled the following from the cases addressing the Maryland economic damages rule:

> The common denominator of the Maryland cases, where no contractual privity existed but nevertheless a tort was found, is that in each case **the relationship of the litigants was close enough that the defendant knew that the plaintiff was likely to take some action based on what the defendant said or did.** No such relationship existed here. Simmons made no showing that he ever relied upon Lennon to spot forgeries of his signature or that he otherwise relied on Lennon in regard to the checks that were paid from his accounts.

*Id.* (emphasis added).

We are not persuaded that *Simmons* requires that we deny a negligence claim by First Equity, because *Simmons* is distinguishable for two reasons. First, as recognized in *Jacques,* 307 Md. at 542, 515 A.2d 756, Farmers is a bank, "invested with enormous public trust." A member of the public who accepts a check in payment for the sale of a used automobile in a private transaction does not have all the responsibilities of a public bank accepting a check for deposit. Second, this case does not involve spotting a forgery. Farmers did not have to spot a forgery in order to satisfy its duty here. The problem with Check 2 was obvious from its face—it was payable to Farmers, but Shannahan wanted to deposit the proceeds in his own account. As we explain in Section IV, if a forgery were involved, then First Equity would have a cause of action against Allfirst under UCC section 4–401. Allfirst could then claim against Farmers under the transfer warranties of UCC section 4–207, and our decision might be different.

In conclusion, we hold that under these circumstances, Farmers had a duty to First Equity to make inquiry about why Check 2 was made payable to it, when Shannahan presented it for deposit into his own account. Because absence of duty is not the only defense raised by Farmers, we next address its claim that there was no proximate cause.

## Proximate Cause

■ Farmers contends that:

First Equity's cause of action in negligence fails also because there is no causation between the alleged harm and the perceived negligence.... [T]he conduct of Farmers was not the action that caused, either proximately or any other way, the failure of the lien to be released.

Farmers further asserts that even if Farmers had applied the proceeds of Check 2 to Shannahan's line of credit debt, the IDOT would not have been released. It explains that "paying off a line of credit one day does not prevent the balance from going right back up the very next day[.]" While this may be so, we do not agree that this operational aspect of a line of credit precludes a finding of proximate cause.

We have already upheld the trial court's finding that Farmers had a duty, when it received Check 2, to make inquiry about why the check was payable to it, when Shannahan claimed it belonged to him. If Farmers had done so, it could have learned that First Equity intended to secure a release of the IDOT. With that knowledge, it would not have been reasonable for Farmers to make a re-advance under Shannahan's line of credit. The trial court found that "Farmers' failure to properly negotiate the check resulted in a material loss to ... First Equity[.]" This finding encompasses proximate cause and is supported by the evidence.

Because we also hold in the next section, however, that the trial court erred in not considering whether First Equity was contributorily negligent, we do not affirm the judgment, but

vacate it and remand for further proceedings.[11]

## II.

### Contributory Negligence By First Equity

■ Farmers contends that the trial court erred in failing to consider whether First Equity's negligence action is barred by its own contributory negligence. Farmers offers the definition of contributory negligence set forth in *Diffendal v. Kash and Karry Serv. Corp.*, 74 Md.App. 170, 173, 536 A.2d 1175 (1988):

> Contributory negligence is defined as "conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bring about the plaintiff's harm." (Citation omitted.)

Farmers points to several acts and omissions of First Equity that it contends were negligent:

> First Equity failed to handle the check in the same manner that it handled the other [Farmers] check that it intended to release a secured note. First Equity breached its duty to understand what to do to obtain clear title for its insured, failed to send the check directly to Farmers with instructions and a release, and failed to follow up with Farmers to make certain that the IDOT was being released.

In reviewing First Equity's response to Farmers' contention in its brief, we find little. First Equity does not address why its actions in sending Check 2 to Farmers via Shannahan, rather than through the mail, as it sent Check 1, were not negligent. Nor does it explain why the instructions sent with Check 1 did not request a release of the IDOT. It says nothing about its failure to discover that the Check 2 loan was secured, and why that error was not negligence. It responds

---

11. Our disagreement with the trial court's use of Md.Code (1974, 2003 Repl.Vol.), section 7–106 of the Real Property Article as the basis for resolving this dispute also precludes affirmance. *See infra* Section III.

simply by saying that there was no finding by the trial court that it was negligent.

While in some circumstances we would decide that a trial court's failure to mention contributory negligence meant that it did not find any, we do not consider that approach appropriate here. First, the trial court blended the negligence rationale with a "payment and satisfaction" theory under RP section 7–106. *See infra* Section III. It reasoned that because First Equity was negligent in not applying Check 2 towards Shannahan's indebtedness under the IDOT, the IDOT was deemed paid and satisfied under RP section 7–106. It may have decided that under this rationale, contributory negligence did not apply. That the trial court wrote a twelve page opinion addressing all the other issues is consistent with this interpretation. As we explain in the next section, however, we do not agree with the trial court's application of RP section 7–106 to resolve this dispute.

Accordingly, we shall vacate the judgment of the trial court and remand this case to the circuit court for it to decide whether First Equity was contributorily negligent.

## III.

### Real Property Section 7–106

■ As mentioned above, the court seemed to blend its negligence theory with a "payment and satisfaction" theory under RP section 7–106. For easy reference, we repeat part of its reasoning that we previously set forth:

[Farmers] did accept the check from First Equity in the amount of $40,760.83 and then extended a payment to Shannahan for the same amount.

The court concludes that [Farmers] negligently failed to apply the funds to Shannahan's outstanding balance of $40,760.83 on the line of credit also referred to in the payoff statement from Farmers as the 3rd DOT. The court finds that the delivery by First Equity of [Check 1] to Farmers Bank (by mail) combined with the delivery by Shannahan of

[Check 2] constitutes a pay-off in full of the Farmers' IDOT and [Farmers] is required to release the IDOT in accordance with the provisions of Section 7–106 of the Real Property Article of the Code.

We do not consider the court's finding that Check 2 was received by Farmers in payment of Shannahan's line of credit debt sustainable when Check 2 was deposited immediately into Shannahan's account. Farmers had received no instruction to release its IDOT. It is undisputed that Farmers did not treat Check 2's proceeds as its own money. There is no evidence that Farmers made any internal bookkeeping entry reflecting receipt of payment and re-advancement of funds to Shannahan. The trial court's finding on this point, a mixed question of law and fact, was clearly erroneous. *See State v. Jones*, 103 Md.App. 548, 589–90, 653 A.2d 1040 (1995)(recognizing that when a mixed question of law and fact has a "heavier factual component," the standard of review is "clearly erroneous").

■ We do not agree that Farmers' receipt of the $40,760.83 from Allfirst, and immediate deposit into Shannahan's account, is equivalent to "payment and satisfaction" for the IDOT under RP section 7–106. In our view, RP section 7–106 only comes into play when a secured lender has **actually** received payment and satisfaction in a substantive sense. This section was not intended as a vehicle to resolve UCC or negligence issues.[12]

Even if the facts in the record could justify the inference the trial court drew, that Farmers received the funds in payment of the loan and immediately advanced them to Shannahan, the requirements of RP section 7–106(d) would not be met. This is so because there was no written request by First Equity to release the IDOT **before** the date Farmers is deemed to have re-advanced the money to Shannahan. RP section 7–106(d) states:

---

12. For a discussion of the "scandal which arose in the Washington metropolitan area relative to delayed real estate settlements," which was the catalyst for this law, *see Attorney Grievance Comm'n v, Lockhart*, 285 Md. 586, 589 n. 2, 403 A.2d 1241 (1979).

Any person who has a lien on real property ... on payment and satisfaction of the lien, **on written request,** shall furnish to the person responsible for the disbursement of funds in connection with the grant of title to that property the original copy of the executed release of that lien....

First Equity had not requested in writing, or otherwise, that the IDOT be released at the time Farmers made the "re-advance" to Shannahan. Notably, the instructions sent by First Equity to Farmers along with Check 1 did not instruct Farmers to pay off its IDOT. When First Equity did request a release much later, the loan was no longer "paid and satisfied" because, under the trial court's theory, it had been re-advanced to Shannahan under the terms of the IDOT.

We think the release of the IDOT is governed, rather, by an agreement we found in the record between First Equity and Farmers. This agreement provided, *inter alia,* that First Equity would place $50,000 in escrow, with the stipulation that the escrow fund would "be distributed in accordance with ... any final judgement," after appellate review. The agreement also stated that if the judgment was paid to Farmers, it would assign the line of credit note secured by the IDOT to First Equity. This agreement between the parties would allow the trial court to order assignment of the note and the IDOT to First Equity, if First Equity prevailed on its claim for damages for negligence.

## IV.

### First Equity's Claim Against Allfirst

First Equity, in its cross-appeal, contends that the trial court erred in holding that it had no cause of action against Allfirst when the latter paid and charged against First Equity's account the $40,760.83 represented by Check 2. First Equity contends that Check 2 was not "properly payable" because it had a missing indorsement, which is equivalent to a forged indorsement. *See Pelican Nat'l Bank v. Provident Bank of Md.,* 381 Md. 327, 340, 849 A.2d 475 (2004).

UCC § 4–401(a) governs when a drawee bank may charge a customer's account:

A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. Any item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank.

"By implication [section 4–401(a) ] tells when a bank 'may not' charge the account." James J. White and Robert S. Summers, *Uniform Commercial Code,* § 15–3, at 553 (5th ed. 2000)("White & Summers").

 We reject First Equity's argument that there was a missing indorsement on Check 2. The trial court found that Farmers was the payee and Shannahan never was a holder. It concluded that Farmers indorsed Check 2 as a payee. In doing so, it decided to

disregard Shannahan's placement of his signature as an indorsement and view [Check 2] as if Shannahan had not attempted to negotiate it. . . . [Farmers] placed its own indorsement on the back of the check as it negotiated it to [Allfirst]. Allfirst correctly dispersed the funds to Farmers[.]

To explain its disregard of Shannahan's indorsement, the trial court relied on UCC section 3–205(d). This section provides: " 'Anomalous indorsement' means an indorsement made by a person who is not the holder of the instrument. An anomalous indorsement does not affect the manner in which the instrument may be negotiated."

We agree with the trial court that Shannahan's indorsement could be disregarded as anomalous. *See* UCC § 3–205(d). When dealing with a negotiable instrument that is payable to an identified person, one who is not that person cannot be the holder, even if he is in possession of the instrument. *See* UCC § 1–201(20). Thus, Shannahan was not a holder. Check 2 was payable to Farmers and Farmers' indorsement as payee was appropriate to transfer the check to Allfirst.

 Neither will we disturb the trial court's factual finding that Farmers effectively indorsed Check 2 as the payee. *See* Md. Rule 8–131(c)("When an action has been tried without a jury, . . . [an appellate court] will not set aside the judgement of the trial court on the evidence unless clearly erroneous"). Farmers indorsed Check 2 on the back, and First Equity points to no authority requiring that a payee indorsement by a bank must be in any particular place or form. 12 C.F.R. § 229.35(a)(2000) and Appendix D thereof, which was cited by First Equity below, addresses depositary indorsements, and does not specify where a payee indorsement must be. There was testimony by an experienced bank officer that while indorsements by individuals are placed on the back, "on the top right-hand edge of the check," that is not the case with stamped bank indorsements, which can be anywhere on the back of the check.

Furthermore, the Official Comment 1 to UCC section 3–204 states:

> In some cases an indorsement may serve more than one purpose. . . . The general rule is that a signature [13] is an indorsement if the instrument does not indicate an unambiguous intent of the signer not to sign as an indorser. Intent may be determined by words accompanying the signature, the place of the signature, or other circumstances.

There was no expert testimony or otherwise that Farmers' indorsement on Check 2 could not serve the dual purpose of a depositary bank indorsement and a payee indorsement. Indeed, Farmers' indorsement on the back of Check 2 is identical to its indorsement on the back of Check 1, the proceeds of which Farmers placed in its own account. Under these circumstances, we reject First Equity's argument that Check 2 was not "properly payable" under section 4–401 because it was missing an indorsement.

---

**13.** UCC section 3–401(b) states that a signature may be made manually or by means of a device or machine.

Our deference to the trial court's factual finding in this instance is not inconsistent with our earlier conclusion that the trial court erred in ruling that because Farmers indorsed Check 2, RP section 7–106 required that Farmers release its lien because it has been "pa[id] in satisfaction of the lien." That Farmers indorsed Check 2 as both depositary bank and payee does not mean that it received the **proceeds** of the check, or that Shannahan's indebtedness secured by the IDOT was paid. UCC section 3–204 states that an indorsement is a signature that can be made for the **purpose** of "(i) negotiating the instrument, (ii) restricting payment of the instrument, or (iii) incurring indorser's liability on the instrument[.]" "Negotiation" simply "means a transfer of possession . . . of an instrument and its indorsement by the holder." UCC § 3–201(a). It does not mean "paid." Here, Farmers negotiated the check for the purpose of depositing the proceeds into Shannahan's account, not its own.

Normally, one who keeps a checkbook or writes a check to a designated payee can assuage any fear about loss because its bank, the drawee, is obligated to pay the loss if there is a forged drawer's signature or forged indorsement. *See* White & Summers, § 15–1, at 547 ("Generally a drawee is not entitled to charge the drawer's account when it pays over a forged drawer's signature or over a forged indorsement"). In the usual case either the drawer's signature is forged, or a legitimate check is stolen or lost, and the payee's indorsement is forged. In that circumstance, UCC section 4–401 would apply, and the check would not be "properly payable" by the drawee bank. In holding that Allfirst has no responsibility for bearing the loss involving Check 2, we do not follow the usual rule because neither the drawer's signature nor any indorser's signature was forged. All of the signatures were genuine. Nor was the check altered. Instead, the loss was caused by events occurring outside the check itself—3—Shannahan's discard of the letter of instruction from First Equity, and his direction to Farmers that the check represented loan proceeds owed to him that he wished to deposit in his account. Thus,

an action in common law negligence was First Equity's appropriate remedy.

A final word of explanation may assist in placing this case in context. Under the circumstances here, the loss-allocation rules of the UCC do not apply to a claim by First Equity for its loss. Rather, the similar common law negligence rules govern. The primary difference in result for First Equity between a cause of action under the UCC against Allfirst and a cause of action in negligence against Farmers is that the doctrine of contributory negligence applies instead of the comparative negligence rule of UCC section 3–406. As we indicated earlier, if First Equity had a cause of action against Allfirst under section 4–401 because a check was forged or altered, then Allfirst could assert in defense that First Equity's negligence had contributed to the forgery or alteration, and the comparative negligence rules would apply. Allfirst would also have a cause of action against Farmers for breach of the transfer warranties established in UCC section 4–207. Thus, the familiar precept that "he who last deals with the wrongdoer fairly bears the loss" would govern who bears the ultimate loss.

## CONCLUSION

In sum, we hold that under these circumstances, the trial court's decision that First Equity could bring a negligence action against Farmers for its violation of the standard of ordinary care in handling Check 2 was correct, and that there was evidence to support a negligence claim. This is a narrow holding, and we do not decide generally that drawers can recover from depositary banks in negligence. There was sufficient evidence to support the trial court's finding that Farmer's negligence was a proximate cause of First Equity's injury. We vacate the judgment, however, because the trial court did not consider the possible contributory negligence of First Equity, and we remand the case to the Circuit Court for Anne Arundel County for such further proceedings as appropriate to make this determination. The circuit court's denial of First Equity's claim against Allfirst is affirmed.

# 194

JUDGMENT AFFIRMED IN PART, AND VACATED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE HALF BY APPELLANTS, ONE HALF BY APPELLEES.